# UNITED STATES

v.

**John C. MOULTAK, 114 50 8978, Captain (0–3), U.S. Marine Corps Reserve.**

**NMCM 84 3695.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 13 July 1984.

Decided 29 Nov. 1985.

---

CDR DAVID C. LARSON, JAGC, USN, Appellate Defense Counsel.

LT MARVA J. DANIEL, JAGC, USNR, Appellate Defense Counsel.

CAPT DAVID B. STRATTON, USMC, Appellate Government Counsel.

Before GORMLEY, C.J., and KERCHEVAL and RAPP, JJ.

GORMLEY, Chief Judge:

Appellant was tried by a general court-martial composed of members and, contrary to his pleas, was found guilty of violation of a lawful general regulation, conduct unbecoming an officer, fraternization, false swearing, and obstructing justice, in violation of Articles 92, 133, and 134 of the Uniform Code of Military Justice (UCMJ).[1] Appellant was sentenced to restriction for a period of two months, forfeiture of all pay and allowances, and dismissal from the service. Upon review below, only so much of the sentence as provided for dismissal, restriction for 60 days, and forfeiture of $1445.00 per month for 120 months was approved.

### FACTS

The charges in the instant case arose from the appellant's sexual and romantic relationship with an enlisted woman Marine, Lance Corporal (LCPL) C. This relationship commenced in approximately October of 1982 while the Captain appellant and the Lance Corporal were both members of Headquarters and Maintenance Squadron-11 (H & MS–11), Marine Aircraft Group-11 (MAG–11), 3d Marine Aircraft Wing (3d MAW), located at Marine Corps Air Station (MCAS), El Toro, California. The appellant was the legal officer of H & MS–11 and LCPL C worked at Group Supply. Prior to October, 1982, their relationship was strictly professional and consisted principally of LCPL C speaking with the appellant in order to provide the unit with the chasers (personnel accompanying military accused) and paperwork needed for legal and administrative proceedings. One day in October, LCPL C was in the H & MS office and asked the appellant for a cigarette. The appellant, Captain Moultak, provided her with a cigarette and a cup of coffee and they conversed. When she found out that he was a pilot, LCPL C asked the appellant if he could take her flying sometime in the near future. Appellant responded affirmatively and LCPL C gave him the phone number of the sergeant's house where she was staying. Shortly thereafter Captain Moultak called her and the next day, a Saturday, they went flying together. When they arrived back to El Toro from the flight late that afternoon, the appellant asked LCPL C for a ride back to his apartment. LCPL C accommodated him and when they arrived at his apartment Captain Moultak invited her inside for a glass of iced tea. Moultak then asked her if she was hungry and they decided to go out to pick up a pizza. Rather than going back to the Captain's house to dine, however, they stopped off at a motel where they ate the pizza and engaged in sexual intercourse. This contact initiated the relationship whose development over the ensuing 18 months resulted in the instant proceedings. Other pertinent facts are contained in the discussion below.

Before this Court, appellant makes the following assignments of error:

### I

ADDITIONAL CHARGE IV AND THE SPECIFICATION THEREUNDER (ALLEGING FRATERNIZATION, IN VIOLATION OF ARTICLE 134, UCMJ) IS MULTIPLICIOUS WITH ADDITIONAL CHARGE III AND THE SPECIFICATION THEREUNDER (ALLEGING FRATERNIZATION IN VIOLATION OF ARTICLE 133, UCMJ). *UNITED STATES V. RODRIGUEZ*, 18 M.J. 363

---

1. 10 U.S.C. §§ 892, 933, 934.

(C.M.A.1984) AND *UNITED STATES V. BAKER*, 14 M.J. 361 (C.M.A.1983).

## II

THE MILITARY JUDGE ERRED TO APPELLANT'S SUBSTANTIAL PREJUDICE WHEN HE ALLOWED THE GOVERNMENT TO MAKE A MATERIAL AMENDMENT TO THE SPECIFICATION UNDER THE CHARGE.

## III

THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE DENIED APPELLANT'S MOTION TO DISMISS DUE TO UNLAWFUL COMMAND INFLUENCE.

## IV

APPELLANT'S CONVICTION FOR ADDITIONAL CHARGE I ALLEGING DISOBEDIENCE OF A LAWFUL REGULATION TO WIT: U.S. NAVY REGULATIONS ARTICLE 1131.1, CANNOT STAND BECAUSE HIS CONDUCT IS NOT WITHIN THE AMBIT OF CONDUCT REGULATED BY THAT ARTICLE.

## V

APPELLANT WAS WRONGFULLY CONVICTED OF FRATERNIZATION PURSUANT TO ARTICLES 133 AND 134 UCMJ.

## VI

APPELLANT WAS DENIED EQUAL PROTECTION OF THE LAW WHEN HE WAS CONVICTED OF FRATERNIZATION WHERE THE SAME OR SIMILAR CONDUCT WOULD NOT SUSTAIN A CONVICTION IN ANOTHER BRANCH OF THE ARMED SERVICES.

## VII

THE MILITARY JUDGE ERRED IN FAILING TO ORDER A NEW ARTICLE 32 HEARING AFTER FINDING THE ACCUSED HAD BEEN DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

## VIII

THE STAFF JUDGE ADVOCATE'S REVIEW WAS INVALID, AND ITS IMPARTIALITY WAS IMPAIRED WHEN THE STAFF JUDGE ADVOCATE COPIED, ALMOST VERBATIM, THE PREPARED OPINION OF THE REVIEWING OFFICER OF A DISQUALIFIED STAFF JUDGE ADVOCATE.

## IX

THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE DENIED APPELLANT'S MOTION FOR DISCOVERY.

These assignments are discussed seriatim.

## I

### MULTIPLICITY

■ We agree with appellant that the specification under Additional Charge IV, alleging wrongful fraternization under Article 134, must be dismissed since it is a lesser included offense of the specification under Additional Charge III, which alleges wrongful fraternization under Article 133. *United States v. Rodriguez*, 18 M.J. 363 (C.M.A.1984). Accordingly, the findings of guilty to Additional Charge IV and its Specification are set aside and that charge is dismissed.

## II

### MATERIAL AMENDMENT TO SPECIFICATION

The Specification under the Charge, alleging the offense of false swearing under Article 134, originally stated, in pertinent part, as follows:

In that Captain John C. Moultak, U.S. Marine Corps Reserve ... did, at Marine Corps Air Station, El Toro (Santa Ana), California, on or about 8 November 1983, in a sworn statement, wrongfully and

unlawfully subscribe under lawful oath a false statement in substance as follows: "I did not take Lance Corporal Kandi C[_____] to the party and I did not see Lance Corporal Kandi C[_____] at the party."

After the defense rested, at an Article 39(a), 10 U.S.C. § 839(a), session during which instructions were being discussed, the military judge pointed out to the parties that the Charge failed to include the allegation that, at the time he made it, the accused did not believe the false statement to be true. The military judge invited argument on the sufficiency of the Specification. The Government urged that the omission of the missing allegation was not material to the charge of false swearing and that the allegation that the statement was made "wrongfully and unlawfully," together with the allegation that the statement was "false," was sufficient to allege an offense. The Government requested in the alternative, if the military judge found the omission to be fatal, to be allowed to amend the Specification pursuant to paragraph 69*b*, *Manual for Courts-Martial, 1969 (Rev.)* (MCM). The defense's position was that the omission was a material one and that the Specification, therefore, failed to allege an offense. Defense counsel posited that allowing the Government to add the missing element at that late stage would be not merely an amendment of the defective Specification, but would constitute a material change which would serve to create an offense where none had originally existed.

Upon considering the arguments of counsel, the military judge found "that the specification as alleged by fair implication alleges the essential element of—'that Captain Moultak did not then believe the statement to be true.'" He denied the defense motion to dismiss for failure to state an offense and, finding that the amendment did not allege "a different or more serious offense" and that the defense was not misled by the wording of the Specification or by the amendment, granted the Government's request to amend the Specification. The Government proceeded to amend the

Charge by adding to the end of the Specification the following: "which statement he did not then believe to be true." The trial then proceeded with the Charge as amended.

■ Paragraph 69*b*, MCM, allows a court to "proceed immediately with the trial upon directing an appropriate amendment" of a defective charge or specification "[i]f a specification, *although alleging an offense cognizable by courts-martial,* is defective in matters of form...." (Emphasis added). A specification can be amended at any time before findings as long as the amendment does not result in (1) a different or more serious offense; (2) raising a substantial question as to whether prosecution is barred by the statute of limitations; or (3) misleading the accused. *United States v. Krutsinger,* 15 U.S.C. M.A. 235, 35 C.M.R. 207 (1965). Thus, we must consider, in order to determine whether the military judge properly allowed the Government to amend the Charge pursuant to paragraph 69*b*, whether the Specification as originally written was sufficient to allege an offense under the UCMJ, and whether the amendment results in a different or more serious charge. The first question to be addressed, therefore, is whether or not the allegation, "that the accused did not then believe the statement to be true," is an essential element of the offense of false swearing under Article 134.

■ Paragraph 213*f*(4), MCM, states that "[f]alse swearing is the making under lawful oath, not in a judicial proceeding or course of justice, of any false statement, oral or written, *not believing the statement to be true.*" (Emphasis added). Thus, we find that non-belief in the statement at the time it was made, as well as the statement's falsity, are essential elements of the offense of false swearing.

■ While a specification is fatally defective if it does not allege every essential element of the offense charged, "[i]t need not aver the elements expressly, but it must at least do so by necessary implica-

tion." *United States v. Fleig*, 16 U.S.C. M.A. 444, 37 C.M.R. 64, 65 (1966); *United States v. Hoskins*, 17 M.J. 134, 136 (C.M.A. 1984). In the instant case, we disagree with the military judge's finding that the Specification alleged "by fair implication" the missing element of non-belief in the statement's truth. The pertinent portion of the pre-amendment Specification simply stated that the accused did "in a sworn statement, wrongfully and unlawfully subscribe under lawful oath a false statement...." Nowhere is it implied that the accused did not believe the statement to be true at the time he made it. Words of criminality such as "wrongfully and unlawfully" cannot in themselves supply an otherwise missing element of the offense. *Fleig*, 37 C.M.R. at 65. We find, therefore, that the Specification cannot be upheld over the accused's objection and in the face of his plea of not guilty. The military judge erred when he allowed the Government to amend the Specification where it resulted in a specification which alleged an offense where previously none was alleged. The military judge's error resulted in the accused being tried on an unsworn, unpreferred, and unreferred charge. The finding of guilty to the Specification under the Charge is therefore set aside and the Charge and the Specification thereunder are dismissed.

## III

### UNLAWFUL COMMAND INFLUENCE

At trial appellant made a motion to dismiss all charges and specifications due to the exercise of unlawful command influence by the Director of the MCAS El Toro Law Center, LTCOL L, over the detailed defense counsel, CAPT McD. Appellant asserted in the motion that he was prejudiced because of actions of the Director, who was also the Staff Judge Advocate (SJA) of MCAS El Toro, which were allegedly taken for the purpose of impeding detailed defense counsel's representation of him. The motion was fueled to a large extent by the Marine Corps' investigation into alleged unethical practices at the Law

Center which, coincidentally, was taking place as the parties in the instant case were preparing for trial. This investigation had been initiated by correspondence from one of the other Station defense counsel complaining of the coercive work environment that existed for defense counsel at the Air Station. The investigation was completed during the trial of the instant case.

Upon considering the briefs and arguments of counsel, and after conducting an *in camera* inspection of the results of the above-mentioned investigation, the military judge denied the motion to dismiss and entered the following findings:

First of all, I find that there has been no unlawful command influence with regard to this particular case. Second, although there may have been some irregularity—irregularities and improprieties, with regard to defense counsel at this particular command, I do not find that they rise to the level of general unlawful command influence with regard to all counsel. Third, any remedy for any alleged irregularity and impropriety, with regard to counsel, do not warrant dismissal of the charges in this particular case. Fourth, there has been no showing that Captain McD is not an independent counsel. Fifth, there is no showing that Captain McD has been hindered in the adequate preparation of this case or subjected to any lawful [sic] command influence with regard to this case. And sixth, that Captain McD is competent to serve as detailed defense counsel in this particular case.

Appellant urges before this Court that the military judge's conclusion that there was no actual unlawful command influence was erroneous, and that his ruling constitutes reversible error because he failed to consider the total effect of LTCOL L's conduct on the *appearance* of fairness. *United States v. Rosser*, 6 M.J. 267 (C.M.A. 1979). We disagree.

▇▇▇ Appellant's claim with respect to the existence of actual unlawful command influence is based upon two factors: (1) the

generally unhealthy climate at the El Toro Law Center caused by the double-hatting of the Director as the MCAS SJA and his control over attorney assignments and fitness report evaluations; and (2) the specific actions taken by LTCOL L which, appellant claims, directly interfered with detailed defense counsel's representation of him— LTCOL L's reprimand of CAPT McD for establishing an attorney-client relationship with the appellant, his alleged attempt to transfer CAPT McD to a non-legal billet, and the 5 day assignment of CAPT McD as rifle range safety officer during the final weeks of preparation for the case. Our study of the record of trial and allied papers, including the results of two independent investigations concerning the alleged improper activities at the El Toro Law Center, reveals that appellant's allegations are unfounded. First of all, CAPT McD's attorney-client relationship with the appellant was revealed months after he had been reassigned to the Legal Assistance Office at the Law Center. Thus, it appeared to his superiors that CAPT McD had established this relationship while he was working as a legal assistance officer, an involvement which is prohibited by Law Center policy in order to facilitate management of legal services and to avoid potential ethical problems. CAPT McD had neglected to inform his superiors of the formation of this attorney-client relationship during his reassignment from the defense shop. Thus, any admonition concerning his representation of the appellant resulted not from any desire to discourage that representation, but from CAPT McD's own sloppy handling of his transition from defense to legal assistance. Additionally, there is no evidence that CAPT McD was threatened with reassignment because of his representation of the appellant or that he was assigned rifle range duty for any malevolent purpose. Nothing in the record indicates that LTCOL L interfered in any way with CAPT McD's representation of the appellant or that CAPT McD was anything less than an independent, zealous defense counsel. Furthermore, while the Law Center investigations reveal that the situation at El Toro raised the specter of potential conflicts of interest between defense counsels' duty of zealous representation of their clients and concern over their fitness report ratings, we agree with the military judge that there was no such conflict in the instant case. Finally, the motion to dismiss due to unlawful command influence was vigorously litigated and appellant was made aware of detailed defense counsel's potential conflict of interest. When given the opportunity to relieve CAPT McD and to request counsel free from any potential conflict, however, appellant declined to do so. Thus, appellant was not prejudiced by the possible existence of this conflict. *United States v. Nicholson*, 15 M.J. 436 (C.M.A.1983). We concur with the military judge's finding that there was no actual unlawful command influence in the instant case.

Appellant also asserts that, at a minimum, the appearance of unlawful command influence existed in the instant case and that this raises "a rebuttable presumption that the recipient of the unlawful command pressure was influenced and the accused prejudiced." *United States v. Alexander*, 19 M.J. 614 (A.C.M.R.1984). Appellant claims that the military judge's failure to address the appearance of unlawful command influence and cause the Government to come forward with evidence to rebut the presumption of prejudice is reversible error. *See Rosser*, 6 M.J. 267.

In *United States v. Cruz*, 20 M.J. 873 (A.C.M.R.1985), the Army Court of Military Review set forth a comprehensive study of unlawful command influence and specifically addressed the concept of the appearance of unlawful command influence. They defined the appearance of unlawful command influence as "an opinion of those outside the system about what has happened inside the system," *Id.* at 883, and determined that in deciding whether a given factual situation has created an appearance of unlawful command influence, a court is "concerned with an opinion held by a substantial segment of the reasonable members of the public." *Id.* at 882. The Court rea-

soned that "[t]he law and the courts concern themselves with the appearance of unlawful command influence because of its deleterious effect on public confidence in the military justice system, not because an accused has any legitimate claim to relief where he has in fact suffered no prejudice but only appears to have." *Id.* at 884. Therefore, "the remedy must relate to the interests of the system rather than those of the appellant." *Id.* at 889.

 In the instant case, the alleged recipient of unlawful command pressures was the detailed defense counsel, CAPT McD. The military judge specifically found that there was "no showing that CAPT McD has been hindered in the adequate preparation of this case" and that he was capable of serving as an independent and competent counsel. The military judge did recognize, however, that there were some "irregularities and improprieties, with regard to defense counsel at this particular command...." These irregularities existed primarily because of the lack of a separate command structure for defense counsel within the law center and the poor leadership of the Director of the El Toro Law Center, LTCOL L, who failed to recognize the vulnerability of the law center structure to allegations of ethical impropriety. The military judge also found, however, that these irregularities did not rise to the level of unlawful command influence generally or in the particular case before him. With this assessment we agree. The military judge inquired extensively of CAPT McD regarding his perceptions of his ability to adequately defend the appellant. CAPT McD repeatedly assured the military judge that he had had adequate time to prepare the case, that he was ready to go to trial, that he had not been influenced by the purported attempts of his superior to undermine his representation of the appellant, and that he was capable of zealously representing the appellant—even if that representation had an adverse effect on his career. In light of such extensive inquiry by the military judge and such forceful assertions of independence by detailed defense counsel, we find that a substantial

segment of the reasonable members of the public would conclude that the proceedings were untainted by improper command pressure. If there was any appearance of unlawful command influence at the commencement of the proceedings, it was allayed by the military judge's conscientious investigation of the potential problem. Thus, there was no appearance of unlawful command influence in the instant case. The fact that the military judge did not specifically utter the words, "appearance of unlawful command influence," is not dispositive. The nature of his inquiry, defense counsel's responses, and the appellant's voluntary and knowing decision regarding his continued representation by CAPT McD were sufficient to dispel any concerns regarding prejudice from actual or perceived unlawful command influence. Even if we assume that there was an appearance of unlawful command influence in the instant case, a reversal of the findings and sentence would be an "unmerited windfall" to the appellant who has demonstrated no prejudice resulting from the alleged unlawful command pressures. *Id.* at 890; *see United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *United States v. Remai,* 19 M.J. 229 (C.M.A. 1985); Article 59(a), UCMJ, 10 U.S.C. § 859(a). We believe that if there were any appearance of impropriety at all, it was in the law center structure as it then existed, and which has since been altered. Appellant's assignment of error is without merit.

## IV

### ARTICLE 1131.1, U.S. NAVY REGULATIONS

 Appellant maintains that his conviction under Additional Charge I, alleging a violation of Article 92 of the UCMJ for disobedience of a lawful regulation (Article 1131.1, *U.S. Navy Regulations 1973*), cannot stand because the alleged conduct was not within the ambit of the conduct proscribed by that regulation.

Article 1131.1, *U.S. Navy Regulations 1973*, provides as follows:

No officer shall borrow money or accept deposits from, or have any pecuniary dealings with an enlisted person, except as may be required in the performance of his duty, and except for the sale of an item of personal property which is for sale to other persons under the same conditions of guarantee and for the same consideration, and never having been the property of a government.

Appellant was charged with jointly purchasing with LCPL C a used 1982 Camaro automobile which cost $9113.00. LCPL C testified that she paid $500.00 of the down payment, and the appellant, $1500.00 of the down payment. LCPL C contributed $200.00 of the first monthly payment of $269.59, and the appellant paid the balance of that payment. Appellant made all remaining monthly payments. Both the Lance Corporal's and the Captain appellant's name appeared on the car documents and the vehicle registration. The car was purchased for the use of LCPL C.

Appellant urges that his conduct is not proscribed by the regulation because there was no coercion, intimidation, pressure or other abuse of rank in his dealings with LCPL C who was, during these transactions, his girlfriend and fiancee. Appellant theorizes that the proscriptions of Article 1131.1 grew out of a need to prevent the abuse or appearance of abuse of rank for one's monetary gain and that, therefore, his pecuniary dealings with LCPL C, being duress free, are not prohibited by the Article.

We disagree with appellant's narrow interpretation of Article 1131. Appellant's argument ignores that there are other reasons for the existence of the regulation besides the desire to protect subordinates from actual or perceived intimidation in financial dealings with seniors. While there are no known cases interpreting Article 1131, it has been judicially determined that the borrowing of money by an officer from an enlisted servicemember "weakens discipline and respect for authority, and is

conduct to the prejudice of good order and military discipline." *United States v. Ours*, 6 C.M.R. 178 (ABR 1952); *United States v. Galloway*, 8 C.M.R. 323 (ABR 1952), *affirmed* 9 C.M.R. 63 (C.M.A.1953). We believe that this applies generally to almost all officer/enlisted pecuniary dealings. Adherence to Article 1131.1 reduces the number of disputes between officers and enlisted personnel which might arise because of pecuniary transactions that have gone awry. Additionally, it prevents the officer from making decisions, or from appearing to make decisions, because of some investment or financial arrangement he has in or with an enlisted servicemember.

We find appellant's assignment of error to be devoid of merit.

## V

## FRATERNIZATION

Appellant asserts that the findings of guilty to Articles 133 and 134 should be set aside because these articles are void for vagueness when the underlying offense is fraternization. He alleges that he had no notice that the conduct alleged was unlawful. Alternatively, appellant argues that even if fraternization is a constitutionally valid offense under Articles 133 and 134, his conduct offends no custom of the service, does not constitute fraternization, and is not criminal conduct. We disagree.

▮▮▮ Articles 133 and 134 are not void for vagueness. *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). This Court has stated on numerous occasions that officers of the Naval Service are on notice that wrongful fraternization with enlisted personnel on terms of military equality is proscribed by Articles 133 and 134. *United States v. Baker*, No. 84 4043 (N.M.C.M.R. 30 August 1985); *United States v. Van Steenwyk*, 21 M.J. 795 (N.M.C.M.R.1985); *United States v. Tedder*, 18 M.J. 777 (N.M.C.M.R.1984), *petition granted*, 19 M.J. 115 (C.M.A.1984); *United States v. Smith*, 18 M.J. 786 (N.M.C.M.R.1984). *See also United States v. Free*,

14 C.M.R. 466 (NBR 1953) and *United States v. Pitasi,* 20 U.S.C.M.A. 601, 44 C.M.R. 31 (1971). We have specifically determined that "Marine Corps officers have been put on notice that relationships between officers and enlisted personnel shall be consistent with good order and discipline and shall not give the appearance of familiarity or undue informality." *Baker, supra* at 4. In *Van Steenwyk, supra,* the Court held

> that where there is extant such a wealth of tradition and usage, case law, and administrative guidance defining with reasonable specificity the parameters of officer-enlisted relationships, that a prudent Navy officer of reasonable intelligence is on notice to exercise prudent judgment in a contemplated officer-enlisted relationship and that bad judgment in which the elements of Article 133 and 134 are present exposes the officer to disciplinary action under the appropriate Article.

*Id.* at 808. The facts adduced at the trial of the instant case support that holding and render absurd appellant's assertion that "he was not properly on notice that his conduct was criminal." The evidence established the following:

—after twice having lunch at "Ma Barker's" just outside of El Toro, appellant and LCPL C "decided then, at that time, that we couldn't be seen out in public in uniform. It could cause suspicion and people would ask questions;"

—appellant and LCPL C refrained themselves from entering a pool party being given at an officer's house until a female officer, who would have recognized C as a Marine lance corporal, had gotten into her car and left the party;

—on 3 October 1983, appellant received a page 11 counseling entry in his record book after a counseling session with his commanding officer admonishing him

for carrying on a relationship with an enlisted servicemember in violation of "orders and policies regarding fraternization" and explaining "the serious implications that noncompliance will have upon a Marine officer and his career;"

—subsequent to this counseling session, after fearing that a fellow officer had recognized C as a Marine enlisted person at Major "Zummo's" halloween party, C informed Major "Zummo" of the potential problem and appellant asked "Zummo" to tell everyone that C's name was "Tammy." "Zummo" said he'd "take care of it;"

—appellant made a false statement to a JAG investigation investigating officer to the effect that he had been with a civilian woman, not LCPL C, at the party;

—the commanding officer of appellant's unit, LTCOL Sweeney, testified that he discussed Marine Corps policy against fraternization at regularly scheduled (monthly) officer meetings and also individually with the appellant since they worked extremely close on a daily basis.

Based on the above, we find that appellant was well aware of the Marine Corps policy against unlawful fraternization and of the severe consequences flowing from failure to adhere thereto. The record clearly reveals that his conduct resulted not from a lack of knowledge or notice about that policy, but, rather, from a deliberate and intentional public flouting of it and from a conscious miscalculation of the strength of his commander's will that the Marine Corps fraternization policy would not be abrogated.

Having reiterated that fraternization, under the old MCM [2], is an actionable offense under either Articles 133 or 134 of the UCMJ and not constitutionally vague, we

---

**2.** Appellant was brought to trial under the old manual (*Manual for Courts Martial 1969 (Rev.)* [MCM]) since he was tried prior to 1 August 1984, the effective date of the new manual

(*Manual for Courts Martial (1984)* [MCM, 1984]). The new manual expressly lists fraternization as an offense punishable under Article 134. MCM, 1984, Part IV, ¶ 83.

look at the alleged misconduct in the instant case "to determine whether it is disgraceful and compromising as contemplated by the statute." *Van Steenwyk, supra* at 802. Each case must be decided on its own merit. *Id.* The test to be used is whether a reasonably prudent Marine Corps "officer of the appellant's grade and experience would conclude that the alleged misconduct under the circumstances was unofficerlike within the meaning of Article 133." *Id.* at 802.

■ We state at the outset that we need not determine at this time whether acts of sexual intercourse and the maintenance of a romantic relationship between officer and enlisted personnel are sufficient, alone, to constitute fraternization under Articles 133 and 134. Our not addressing this narrow issue should not be read as a condonation of this type of behavior. It is merely recognition that appellant's alleged acts of fraternization encompass a wider variety of much more egregious conduct than can be described merely as a private, consensual, non-deviate relationship between an officer and an enlisted person not under that officer's command or immediate authority. *See United States v. Johanns,* 17 M.J. 862, 869 (A.F.C.M.R.1983) (*en banc*) [*Johanns I*]; and *United States v. Johanns,* 20 M.J. 155, 157 (C.M.A.1985) [*Johanns II*]. The evidence demonstrates that, after commencing a romantic and sexual relationship with her, appellant coached LCPL C extensively prior to her appearance before a board, of which he was a member and in which he actively participated, convened in order to determine her potential for meritorious promotion. That board endorsed her. The testimony revealed as well that the relationship between the appellant and the Lance Corporal was more public than private in nature—they twice ate lunch together in uniform on working days at an establishment close to El Toro; appellant attended numerous H & MS-16 and Group Supply softball and volleyball games in which LCPL C was a participant, and in which they together

took part in the "beer bust" and "refreshments" provided afterwards; they went together to three parties thrown by and attended by officers-only where they futilely attempted to conceal the fact that LCPL C was an enlisted Marine by, among other things, introducing her by the name of "Tammy"; they went out "partying" together with other officers; they continued seeing each other in public after being counseled by their respective commanding officers and after promising that they would terminate the relationship; they solicited a senior officer's assistance in attempting to conceal the true identity of LCPL C; and they went out in public together on various occasions with LCPL C's roommate, also an enlisted woman Marine. Appellant lied to fellow officers concerning the identity of LCPL C, deceived his commanding officers concerning his intentions to terminate the relationship, and falsely swore to an investigating officer that he had not attended a halloween party with LCPL C. Additionally, the appellant and the Lance Corporal were, for at least part of the time that they were seeing each other, members of the same command. Finally, appellant sought to obstruct justice by having LCPL C testify falsely regarding their relationship and by asking her to ensure that her enlisted roommate would provide a false alibi for her with respect to the night they were seen together at the halloween party. After reading the record, one can only conclude that appellant's conduct constituted a deliberate and public show of contempt for authority. We find that appellant consciously weighed the Marine Corps fraternization policy against his own, at first, physical and, later, emotional desires to maintain a sexual and romantic relationship with a subordinate. In determining that his personal desires outweighed the policy of the Marine Corps, the Captain appellant was willing to, and did, compromise his integrity, the trust and confidence of his seniors and peers, and the respect of his subordinates. His actions reflect an abysmal lack of the judgment demanded of Marine Corps and Navy officers. Under these circumstances we find

that appellant's conduct was indeed unofficerlike within the meaning of Article 133 and that a Naval officer of appellant's grade and experience would have no trouble so concluding. We find, therefore, that this conduct did constitute fraternization and was criminally punishable under Article 133. Appellant's assignment of error is rejected.

## VI

## EQUAL PROTECTION

■ Appellant next asserts that his conviction for fraternization deprives him of equal protection of the law pursuant to the fifth amendment of the Constitution of the United States in that the same or similar conduct for which he was convicted would not sustain a conviction in another branch of the armed services. Appellant cites *United States v. Johanns*, 17 M.J. 862 (A.F.C.M.R.1983) (*en banc*) [*Johanns I*] and Army Regulation 600–20 to argue that he could not have been held criminally liable for his conduct in the Air Force or Army.

In *Johanns I*, the Air Force Court of Military Review held that "the custom in the Air Force against fraternization has been so eroded as to make *criminal prosecution* against an officer for engaging in mutually voluntary, private, non-deviate sexual intercourse with an enlisted member, neither under his command or supervision, unavailable." *Id.* at 869 (original emphasis) (footnote omitted). The Court of Military Appeals, in affirming the decision of the Air Force Court, recognized that the Air Force "has never honored some of the customs recognized in the senior services," and noted that, "perhaps because both officers and airmen at one time served together in small flight crews, the barriers placed by custom between officers and enlisted persons have probably always been lower in that Service than in the others." *United States v. Johanns*, 20 M.J. 155, 160 (C.M.A. 1985) [*Johanns II*]. Army Regulation 600–20 provides, in pertinent part, that "[r]elationships between servicemembers of different ranks which involve, or give the appearance of, partiality, preferential treatment, or the improper use of rank or position for personal gain, are prejudicial to good order, discipline, and high unit morale ... [and] will be avoided."

While *Johanns I* and the cited Army regulation may provide a higher tolerance for officer/enlisted relationships in the Air Force and Army, appellant fails to demonstrate that he would not be held criminally liable for *his* alleged conduct under these lesser standards. We believe that appellant's conduct would have subjected him to disciplinary action even under the more liberal Air Force and Army standards.

*Johanns I* held simply that, in the Air Force, an officer could not be held criminally liable for fraternization when the conduct engaged in was mutually voluntary, *private*, non-deviate *sexual intercourse* with an enlisted member *neither under an officer's command or supervision*. In the instant case, however, the conduct constituting the alleged fraternization is not merely private, consensual sexual intercourse. The alleged fraternization included, besides the sexual intercourse, maintaining a romantic relationship with an an enlisted Marine; during this relationship sitting as a member of a meritorious promotion board in front of which that enlisted Marine was appearing and discussing with her, prior to her appearance before the board, questions which might be asked to determine her qualifications for promotion; attempting to conceal the relationship through deception; and giving gifts of money and goods to a subordinate. Additionally, the evidence demonstrated that appellant took the Lance Corporal to various officer-only social functions, and did escort the Lance Corporal to social functions attended by enlisted personnel. These acts encompass a far broader range of fraternization-type activity than the wholly private sexual intercourse which the Air Force found to be non-actionable in *Johanns I*.

The public nature of appellant's relationship with the Lance Corporal, together with the fact that he was, at certain times during this relationship, a superior officer in the same unit as the Lance Corporal, easily distinguishes the instant case from *Johanns I.* Thus, even under the lax Air Force standard, we believe appellant would have been disciplined for his unofficerlike conduct.

That appellant's conduct would have been actionable in the Army is even more readily ascertainable. At a very minimum, the assistance appellant provided to the Lance Corporal in preparation for the meritorious promotion board on which he was sitting gave the appearance of partiality and preferential treatment and was thus violative of Army Regulation 600–20.

Although we believe, under the facts of this case, that appellant could have been disciplined in both the Air Force and the Army for his conduct, we need not base our decision on this speculation. The discussion above demonstrates merely that the various Armed Services, just as they have different standards with respect to hair length, facial hair, uniform appearance, appropriate civilian attire, marksmanship, physical fitness etc., also have different standards with respect to the type and degree of social intermixing allowed between officers and enlisted personnel. That the Services have different rules and regulations with respect to the same types of behavior is not constitutionally impermissible. In *United States v. Hoesing*, 5 M.J. 355 (C.M.A.1978), the Court of Military Appeals made it clear that "[i]n permitting the Secretary of each service to propound regulations for the government of his respective service, Congress sanctioned distinctions between the treatment of personnel in the various services." 5 M.J. at 358. The Court concluded that

> appellants' argument for interservice equality of treatment would require all services to adopt the same punitive regulations, as the absence of a regulation in

one service would prohibit the imposition of any punishment for a violation of a regulation in another service. Congress has never required such uniformity among the services, and it has consistently authorized the Secretary of each armed force to promulgate regulations to meet special needs of his service, as determined by him.

*Id; see also United States v. Powell,* 8 M.J. 260 (C.M.A.1980). The United States Navy and Marine Corps are different military organizations from the Army or Air Force, each with its own distinctive mission and, consequently, each with its own distinctive regulatory needs. Unlike the Air Force, the Navy and Marine Corps have a long-established tradition which sets limits on the relationships of officers with enlisted personnel. Sailors and Marines have served together more often not "in small flight crews" as in the Air Force, *supra* at 834 (quoting *Johanns II* at 160), but in large ships where separate messing and berthing facilities have traditionally been maintained. This separateness of facilities for officers and enlisted personnel does not exist for the purpose of

> maintain[ing] a social caste system but to maintain respect for authority and to avoid having decisions, which may well involve important matters (including risk of life and the welfare of the command and nation) compromised, or perceived to be compromised, by inappropriate personal relationships. Respect for authority is a cornerstone of discipline, intangible though it may be.

*Van Steenwyk, supra* at 808. The mission of the Marine Corps makes it especially sensitive to the requirements of discipline and respect for authority. The Corps is a ready fighting force expected to move promptly in time of peace or war to troubled areas anywhere in the world. Marines are expected to fight in combat environments not faced by other armed forces. Success in these missions depends to a large extent upon the discipline, leadership, and unit cohesion which is fostered daily in training and in garrison. The old truism,

"Familiarity breeds contempt," warns that an emasculation of the Marine Corps fraternization policy would severely hinder this essential intangible. It is relevant to note as well that, rather than resenting the concept of separate social facilities and events, most enlisted personnel and officers welcome the opportunity to be able to enjoy themselves socially with their own peers, unfettered by the somewhat inhibiting presence of their seniors or subordinates.

Appellant was not denied equal protection of the law. This assignment of error is without merit.

## VII

### FAILURE TO REOPEN THE ARTICLE 32 INVESTIGATION

Appellant's assignment is based on the inability of his civilian counsel, because of his trial schedule, to be present at the two initial sessions of appellant's Article 32, 10 U.S.C. § 832, investigation. The pretrial investigation was originally scheduled for 21 March 1984. Appellant initially contacted his civilian counsel on 20 March and formally retained him on 21 March. At that time, since civilian counsel would be unable to attend the Article 32 session because of prior commitments, he instructed appellant to ask his detailed military defense counsel to request a continuance of the session until civilian counsel would be able to attend. At the 21 March Article 32 session, detailed defense counsel made the continuance request but, pursuant to the request of Government counsel, the investigating officer went ahead and heard the testimony of the Government's chief witness—LCPL C. The investigating officer assured detailed defense counsel that a full transcript would be provided to civilian counsel and that he could have an opportunity to cross-examine her, if he desired, at the next Article 32 session. In a discussion with the SJA and Government counsel the following week, civilian counsel made it clear that he would be unavailable to appear at any proceedings on the appellant's behalf until 27 April since he was due to be

in court every working day until that date. When the SJA suggested that the next session of the pretrial investigation be conducted on Saturday 7 April since, presumably, the civilian courts would be closed on the weekend, civilian counsel informed him that he would be unavailable on that date because of prior commitments in New Mexico. Civilian counsel again insisted that the earliest possible date on which he could appear for the Article 32 investigation was 27 April.

Despite these defense protestations, the 32 was scheduled for and held on Saturday 7 April, absent civilian defense counsel. In anticipation of this eventuality, appellant and civilian counsel prepared a declaration for the investigating officer informing him of the civilian counsel's unavailability and directing military defense counsel not to cross-examine witnesses since, the appellant stated, this was the primary responsibility of his civilian counsel. At trial, the appellant, through his civilian counsel, made a motion for appropriate relief requesting that the Article 32 pretrial investigation be reopened since he was denied his constitutional right to have his attorney present at that critical stage of the proceeding. After considering the briefs and extensive arguments of counsel, the military judge made the following findings:

1) the accused was denied a substantial pretrial right on 21 March 1984 and again on 7 April 1984;

2) it was an abuse of discretion to continue with the testimony of a witness in the absence of a request for civilian counsel, who had been retained;

3) there was no apparent need of such haste due to the nature of the offenses;

4) the accused took reasonable steps to engage counsel; and

5) there is no unreasonable delay on the part of the defense, or that the delay would have inconvenienced or prolonged any particular interest the Government may have had in the case.

To remedy the deprivation of this substantial right, the military judge ruled that he would allow the defense an opportunity to cross-examine under oath all of the witnesses who were called to testify at the Article 32 proceeding. The military judge specifically stated that he was *not* authorizing a reopening: "I'm giving the defense a discovery opportunity and that is the sole remedy. Not another 32. The sole remedy is a discovery devise [sic] so that the accused will have the benefit of his right to cross-examine all of the witnesses." Appellant contends that this remedy was ineffective because, since the investigation had been completed and the investigating officer's report had already been submitted, it did not cure the deprivation of his right to civilian counsel vis-a-vis one of the primary purposes of the Article 32 pretrial investigation—to serve "as an impartial inquiry into the charges against an accused and as the basis for the recommendation concerning their disposition." *United States v. Wager*, 10 M.J. 546, 550 (N.C.M.R.1980).

■ We agree with appellant that he has a right to be represented by civilian counsel instead of, or in addition to, appointed military counsel at an Article 32 proceeding. *United States v. Nichols*, 8 U.S.C.M.A. 119, 23 C.M.R. 343 (1957); *see also United States v. Maness*, 23 U.S.C.M.A. 41, 48 C.M.R. 512 (1974). We disagree, however, that the remedy proposed by the military judge, as interpreted and as acted upon by the convening authority, was inadequate to effectuate this right. Appellant fails to note that upon ordering the investigating officer, pursuant to the military judge's order, to hear the witnesses' testimony again in order to afford the civilian defense counsel an opportunity for cross-examination, the convening authority also directed the investigating officer to prepare a supplemental report to "include your recommendations as to disposition of all charges ... based upon all the evidence presented to you, both during the original investigation and at these new hearings." Thus, the practical effect of the convening authority's direction to the investigating officer was to reopen the Article 32 investigation so that the investigating officer could consider the defense's cross-examination of the government witnesses in arriving at a just disposition of the charges. This assignment of error is, therefore, devoid of merit.

## VIII

## THE STAFF JUDGE ADVOCATE'S (SJA) REVIEW

■ Because of his involvement in extensive post-trial publicity and media coverage, the convening authority, the Commanding General of the 3d Marine Aircraft Wing (3rd MAW), Fleet Marine Force Pacific, felt it would be inappropriate for him to function as the reviewing authority in the case. This involvement manifested itself through the answering of questions in interviews with the press and in the writing of a letter to the editor of a local newspaper in response to letters from the public to the newspaper which had been generated from its coverage of appellant's trial. The convening authority's legal advisor, the 3rd MAW SJA, was also involved in media coverage related to the case in a similar manner. The convening authority, therefore, transferred the case to his superior, the Commanding General of Fleet Marine Force Pacific (FMFPAC), for post-trial review. The FMFPAC SJA presented his review to the Commanding General only nine days after the voluminous record of trial was transferred to his command. This expeditious review was accomplished through the use of a draft review which had been written by the review officer assisting the 3rd MAW SJA. Appellant now claims that the FMFPAC SJA's adoption of this draft review was improper because, he alleges, it was written by an officer in the chain of command of a disqualified convening authority and SJA. We disagree.

A convening authority may not refer charges or perform a post-trial review in a case in which he is an accuser. An "accuser" is defined by Article 1(9) of the UCMJ, 10 U.S.C. § 801(9), as "a person who signs and swears to charges, any person who

directs that charges nominally be signed and sworn to by another, and any other person who had an interest other than an official interest in the prosecution of the accused." The "true test of a convening authority's disqualification to refer charges or to perform post-trial review continues to be 'whether, upon the particular facts and circumstances ... a reasonable person would impute to him a personal feeling or interest in the outcome of the litigation.'" *United States v. Crossley,* 10 M.J. 376 (C.M.A.1981) (quoting *United States v. Gordon,* 1 U.S.C.M.A. 255, 2 C.M.R. 161 (1952)).

In light of the considerable media coverage the case had already attracted, it was commendable for the convening authority to avoid the slightest innuendo of impropriety and to discourage further controversy by transferring the case to the FMFPAC SJA for post-trial review. After reading the exhibits constituting his and his SJA's involvement with the publicity in the case, however, we do not find that he was legally disqualified from acting as the reviewing authority. Their involvement with the media was official and not personal, and evidenced no clear predisposition by the convening authority as to the salient issues in the case. *See United States v. Crossley,* 10 M.J. at 377. Reviewing authorities are not automatically disqualified by post-trial interviews with the press. *See United States v. Parini,* 12 M.J. 679 (A.C. M.R.1981), *pet. denied,* 13 M.J. 210 (C.M.A. 1982). Thus, the 3rd MAW review officer was not disqualified from writing a draft of the post-trial review in the case.

■ Furthermore, even assuming that the convening authority and his SJA were disqualified, there is no evidence that the review officer was statutorily disqualified or that he was influenced by the positions the reviewing authorities were taking in the press when he drafted the review. He was never a member, military judge, trial counsel, assistant trial counsel, defense counsel, assistant defense counsel, or investigating officer in the case and, therefore, at no time "acted in a prohibited capacity in

the 'same case'" *United States v. Thompson,* 3 M.J. 966, 968 (N.C.M.R.1977); *see also* Article 6(c), UCMJ, 10 U.S.C. § 806(c).

The assignment of error, therefore, has no merit.

## IX

### DISCOVERY REQUEST

Prior to trial, appellant submitted a discovery request to the convening authority, via the trial counsel, asking for ten items. Requested items H and J consisted of all records of officer misconduct which had appeared before the convening authority, whether or not they had resulted in any type of action taken against the officers, and all correspondence relating to alleged acts of misconduct in the specific cases of two officers—CAPT S and 1STLT B. These requested items were not provided to the appellant. At trial, appellant made a motion for discovery which was denied by the military judge. Appellant now claims that the military judge abused his discretion in denying this motion. Appellant asserts that the denial of the requested items prejudiced him because it deprived him of evidence needed to support his motion to dismiss based upon selective prosecution. The military judge, upon considering the briefs of counsel, had denied this motion to dismiss.

■ It is well-established that a "defendant must prove a 'colorable entitlement' to the defense of selective prosecution before discovery is allowed." *United States v. Murdoch,* 548 F.2d 599, 600 (5th Cir.1977). The accused must show that others similarly situated have not generally been prosecuted and "that the Government's prosecution of him was selective, invidious, in bad faith, or based on impermissible considerations such as race, religion, or his exercise of constitutional rights." *Id.; see also Wayte v. United States,* —— U.S. ——, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985).

■ In the instant case, the record establishes that appellant "was not singled

out for prosecution for any reason other than his failure to comply with the law." *Murdoch,* 548 F.2d at 601. The military judge had before him various documents demonstrating that other fraternization cases had been prosecuted in the Marine Corps. Additionally, in response to the request of civilian counsel concerning the disposition of the case involving CAPT S, the convening authority wrote a letter to civilian counsel explaining the steps being taken with respect to the alleged misconduct and invited him to speak to the SJA, who knew much more about the case, if he wished to discuss CAPT S's case further. This invitation was not accepted by civilian counsel. The military judge also had before him an explanation of the disposition of the allegations against 1STLT B, contained in the trial counsel's brief opposing the motion to dismiss. This established that administrative rather than court-martial action was taken against 1STLT B because of a lack of jurisdiction and a lack of evidence. Thus, we find that in light of the evidence before him, the military judge did not abuse his discretion when he denied the appellant's motion for discovery.

Accordingly, the findings of guilty and the sentence, as modified above, are affirmed. The findings of guilty to the Charge and to Additional Charge IV are set aside. Those charges are dismissed. Upon reassessment of the sentence, we find that no relief is warranted. The approved sentence is entirely appropriate for the findings of guilty to the charges which remain after our action above.

Judge KERCHEVAL and Judge RAPP concur.